UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED SATES OF AMERICA, | ) ) ) Criminal No. 19-cr-26-02 (CKK) |
| v. | ) ) |
| MAHSA AZIMIRAD, | ) ) |
| Defendant. | ) ) |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

From August 2012 through at least May 2015, Bilal Ahmed, a dentist entrusted with providing medical treatment to the District's most vulnerable residents and accurately billing for those services, and his co-defendant and office manager at his dental practice Universal Smiles, Mahsa Azimirad ("the Defendant"), orchestrated a prolonged fraud scheme at the expense of a government program intended to aid the poor. Over a nearly three-year period, the Defendant submitted false and fraudulent bills to D.C. Medicaid of at least $813,184 to get rich on the back of a taxpayer funded program intended to benefit low-income and disabled residents of this city. For this conduct, the Defendant deserves—and the public trust demands—significant punishment. Accordingly, the government urges the Court to impose a Guidelines[1] compliant sentence of 30 months, impose a 3-year period of supervised release, order the Defendant to pay $813,184 in restitution, and enter a forfeiture order of $813,184 – a sum reflecting the riches she amassed at the expense of taxpayers and D.C. Medicaid's intended beneficiaries. Consistent with the plea agreement in this case, although the United States is requesting a sentence of incarceration, we do

---

[1] The United States Sentencing Commission, *Guidelines Manual* (2018) is referred to throughout this Memorandum as the "Sentencing Guidelines," "Guidelines," or "U.S.S.G."

not oppose the Court ordering some portion of the 30 months sentence to be completed via home detention as a substitute for imprisonment.

I. **Relevant Procedural Background**

On January 29, 2019, the United States of America filed a seven-count indictment charging the Defendant and Ahmed each with Conspiracy (Count 1), Health Care Fraud (Count 2) and Wire Fraud (Counts 3 through 7), in violation of 18 U.S.C. §§ 371, 1347 and 1343, as well as a forfeiture allegation. On February 4, 2019, the Defendant and Ahmed made their initial appearances in the case and were arraigned on the indictment. On February 10, 2020, Ahmed was sentenced to 71 months imprisonment and 36 months of supervised release. The sentence of imprisonment was ordered to run concurrently with the 16-year term of imprisonment imposed against him in a DC Superior Court case stemming from his sexual abuse of patients at the same dental practice. Additionally, he was ordered to pay restitution in the total amount of $5,421,227.

On May 24, 2021, the Defendant entered a guilty plea to one count of Health Care Fraud (Count 2), in violation of 18 U.S.C. § 1347.

II. **Factual Background**

A. **Chronology of Relevant Events**

Ahmed was previously a licensed dentist in the District of Columbia and the sole proprietor of Universal Smiles dental practice ("Universal Smiles"), located at 2311 M Street, N.W., Suite 400, Washington, D.C. The Defendant was hired as the office manager for Universal Smiles. The Defendant also owned and operated Emerald Consultants, LLC, a company that purported to provide marketing services first to Universal Smiles and then to the same dental office under its new name, Dental Equipment and Services, LLC ("DES").

In May of 2011, the Defendant began working as Universal Smiles, as the office manager and Director of Operations and Marketing. In addition to managing all the Medicaid billing, the Defendant contracted for commercials that advertised Universal Smiles and its acceptance of both Medicaid and additional types of insurance to be run on a local television station, WDC50, to attract patients. Ahmed agreed to pay the Defendant 15% of the practice's monthly income after expenses and such payments were made to the Defendant's company, Emerald Consultants. (Until the end of 2014, she was also paid a regular salary.)

On March 9, 2012, Ahmed, doing business as Universal Smiles, submitted a provider application to the D.C. Department of Health, Medical Assistance Administration, to become a group D.C. Medicaid dental provider. Ahmed became an approved group D.C. Medicaid dental provider effective on June 13, 2012.

Around February 26, 2014, the D.C. Department of Healthcare Finance ("DHCF") issued a notice of suspension of D.C. Medicaid payments to Universal Smiles. On June 24, 2014, the D.C. Office of Administrative Hearings upheld the DHCF's decision to suspend D.C. Medicaid payments to Universal Smiles. On or about November 19, 2014, the D.C. Dentistry Board executed a consent order that suspended Ahmed's D.C. dentistry license for no less than one year.

On January 7, 2015, after Ahmed's license was suspended, Ahmed formed a limited liability company in Maryland called Dental Equipment and Services, LLC ("DES"). DES purportedly engaged in the business of providing business support services required by dental practices, both in their start-up and established phases, in addition to providing office space, equipment, technology, human resources, furnishings, supplies, inventory, and marketing services. Some of the dentists who came to work for DES after Ahmed's dental license was suspended entered into business agreements with DES. These agreements list the "practice site" as 2311 M

Street, N.W., Suite 400, Washington, D.C. 20037, the same location as Universal Smiles' office. After the office was re-branded as DES, the Defendant continued to function as the office manager – overseeing all of the billing to Medicaid between November 17, 2014 and February 1, 2016.

### B. The Scheme and Conspiracy

The Defendant and Ahmed defrauded Medicaid by submitting false claims for provisional crowns that were not provided to beneficiaries. When the integrity of a tooth is compromised, but extraction is not necessary, the tooth can be shaved down and capped with a permanent crown. While the permanent crown is fabricated, a temporary crown or a provisional crown may be installed on the shaved tooth. A temporary crown typically was used on a shaved tooth to protect it for about a week until the permanent crown was available. A provisional crown was used when additional treatment had to be performed prior to the patient receiving a permanent crown or when a patient required extended time to heal from other procedures. A provisional crown could remain in the mouth for a longer duration than a temporary crown, and typically could be left on the shaved tooth for up to six months.

The fraudulent Medicaid billing scheme was executed by Ahmed and the Defendant, separately and together, through a variety of means, including but not limited to:

1. Ahmed placing the Defendant in charge of billing and solely in charge of Medicaid billing;

2. The Defendant having access to all of the dentists' log-in information for Medicaid billing;

3. The Defendant controlling the billing information that was submitted to Medicaid, even when she was not physically in the office and after a third-party biller was hired;

4. The Defendant monitoring and correcting, and if needed entering herself, the Medicaid billing information after a third-party biller was hired;

5. Ahmed annotating beneficiaries' dental records, directly or indirectly through assistants, to add provisional crowns that he did not provide;

6. The Defendant submitting false claims to Medicaid for provisional crowns or other services that were not supported by or that conflicted with the services contained in the beneficiaries' dental records, including for missed or rescheduled appointments and for beneficiaries who had no teeth;

7. The Defendant accessing bank accounts and post office boxes that Ahmed required dentists to open; and

8. The Defendant knowingly and willfully ignoring fraudulent entries in beneficiaries' dental records and fraudulent Medicaid billing.

In furtherance of their conspiracy and scheme to defraud, the Defendant and Ahmed made false claims to Medicaid for provisional crowns for patients who wore complete sets of dentures and had no teeth. For example:

1. Between July 11, 2013, and February 3, 2014, they submitted claims to D.C. Medicaid in which they falsely claimed to have provided Medicaid Beneficiary XXXX4124 with 51 provisional crowns, knowing that the dental services had not been provided because the beneficiary had a complete set of dentures and no teeth.

In addition, the Defendant and Ahmed made false claims to Medicaid for the repeated delivery of an excessive number of provisional crowns, sometimes hundreds for a single patient. For example:

1. Between April 3, 2013, and February 19, 2014, they submitted claims to D.C. Medicaid in which they falsely claimed to have provided Medicaid Beneficiary XXXX0996 with 524 provisional crowns, knowing or deliberately ignoring that the dental services had not been provided; and

2. Between July 24, 2013, and January 30, 2014, they submitted claims to D.C. Medicaid in which they falsely claimed to have provided Medicaid Beneficiary XXXX5916 with 295 provisional crowns, knowing or deliberately ignoring that the dental services had not been provided.

Overall, reimbursements for provisional crowns accounted for $5,421,227 of the money that Medicaid paid to Universal Smiles from August 9, 2012, through on or about February 26,

5

2014, and an undetermined but significant number of the provisional crowns reimbursed were not actually provided to patients.

After Ahmed's license was suspended for the fraud and the dental office was re-opened as DES with new dentists working at the office, the Defendant and Ahmed continued to submit false claims. For example:

1. They submitted a claim to D.C. Medicaid in which they falsely claimed that on April 7, 2015, in the District of Columbia and elsewhere, dental services were provided to Medicaid Beneficiary XXXX0373, that is the placement of 15 provisional crowns, knowing or deliberately ignoring that the dental services had not been performed because the patient's file reflects that the patient received three provisional crowns;

2. They submitted a claim to D.C. Medicaid in which they falsely claimed that on May 7, 2015, dental services were provided to Medicaid Beneficiary XXXX3370, that is placement of 14 provisional crowns, knowing or deliberately ignoring that the dental services had not been performed because the patient's file reflects that the patient received dental services on one tooth only; and

3. They submitted a claim to D.C. Medicaid in which they falsely claimed that on or about May 7, 2015, dental services were provided to Medicaid Beneficiary XXXX2012, that is the placement of 6 provisional crowns, knowing or deliberately ignoring that the dental services had not been performed because the patient's file reflects that no new provisional crowns were provided.

### III. Applicable Guidelines Range

The parties have stipulated, and the United States Probation Office has agreed, that after taking into account a three-point downward adjustment based upon the Defendant's acceptance of responsibility, the Defendant's total offense level under the Guidelines is 17. Based on a criminal history score of zero points (Criminal History Category I), that offense level calls for a sentence of 24 to 30 months of incarceration. Under the plea agreement, the parties have agreed that "a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of

all of the factors set forth in 18 U.S.C. § 3553(a)." However, the government further agreed not to oppose the Court ordering some portion of the sentence to be completed via home detention as a substitute for imprisonment.

## IV.   Section 3553 Factors Weigh In Favor of a Guidelines Sentence

"A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence . . . [T]he correct [approach] . . . is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)." *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007); *see also United States v. Terrell*, 696 F.3d 1257, 1261-62 (D.C. Cir. 2012); *cf. Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that a within- Guidelines sentence may be presumed reasonable on appeal). Pursuant to 18 U.S.C. § 3553(a), in determining the particular sentence to be imposed, the Court is to consider, *inter alia*:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> . . .
> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7)  the need to provide restitution to any victims of the offense.

18 U.S.C. ' 3553(a). "The district court is not required to refer specifically 'to *each* factor listed in § 3553(a),' nor is it required 'to explain sua sponte why it did not find [a particular] factor relevant to its discretionary decision' if 'a defendant has not asserted the import of [that] factor.'"

7

*United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007) (quoting *United States v. Simpson*, 430 F.3d 1177, 1186-87 (D.C. Cir. 2005)). The Court must impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).

### A. Nature and Seriousness of Offense

In fashioning a reasonable sentence pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider the nature and circumstances of the offense. The serious and long-term nature of this health care fraud scheme supports the imposition of a significant period of incarceration.

#### 1. *Breadth of the Fraud Scheme*

The Defendant and Ahmed enriched themselves at the expense of taxpayers and to the detriment of Medicaid's intended beneficiaries by fraudulently billing Medicaid. Medicaid paid Universal Smiles – which had no Medicaid patients prior to 2012 – a total of $12,434,835.10, from August 9, 2012, through February 26, 2014, a period of about 18 months. Reimbursements for provisional crowns accounted for $5,421,227 (44%) of payments by Medicaid to Universal Smiles during this 18-month timeframe.

To give a sense of a breadth of the fraud scheme in which the Defendant and Ahmed engaged, from August 9, 2012, through February 27, 2014, a period of about 18 months, they caused Medicaid to pay Universal Smiles for over 25,000 provisional crowns. This number dwarfs the number of provisional crowns being billed for by other dental providers during the same period. In comparison, of the other dental providers that billed Medicaid for provisional crowns during this period: most (20 out of 29 total) billed for less than 50 provisional crowns during this time frame, 7 billed for between 50 and 150, and 2 billed for between 300 and 500 provisional crowns during that same 18-month period.

The breadth of the fraud is even more apparent when looking at how Medicaid was billed

8

for these provisional crowns as it relates to specific patients. From August 9, 2012, through February 26, 2014, the Defendant and Ahmed billed for several hundred provisional crowns *each* for several beneficiaries. Further, they billed for 102 or more provisional crowns each for approximately 100 of the beneficiaries; for 50 to 97 provisional crowns each for approximately 48 of the beneficiaries; and for 25 to 49 provisional crowns each for approximately 50 of the beneficiaries. Humans only have 32 teeth. The idea that these beneficiaries were receiving multiple provisional crowns on all their teeth (sometimes multiple times) is ludicrous.

The breadth of the scheme in this case is illustrated by how often the Defendant was faced with a choice to do the right thing or continue defrauding Medicaid. On the most basic level, she had a choice to make every time she entered a fraudulent bill – which in this case amounted to thousands of entries spread out over a period of nearly three years. For example, in July 2013, the Defendant entered over 1,200 entries for provisional crowns. This means in July of 2013 alone, she made a choice over 1,200 times to engage in fraud. Similarly, in January 2014, the Defendant entered over 3,000 entries for provisional crowns, i.e., making the choice over 3,000 times to engage in fraud.

She also made a choice to continue to commit fraud even after they had already gotten caught and had to restart the business. Specifically, even after Ahmed's license was suspended in February 2014 and he was no longer caring for patients, the Defendant and Ahmed continued to falsely submit claims for provisional crowns to Medicaid -- this time by falsely submitting Medicaid bills for provisional crowns under the names of the other dentists hired to work at the practice (unbeknownst to those dentists). Despite watching Ahmed's license be suspended and then dealing with the fallout from that suspension (including needing to re-open the office under a new name, hire new dentists, and then assist them in filing out Medicaid provider applications),

the Defendant once again chose to repeatedly engage in fraud. Indeed, as noted in the Statement of Offense, they submitted false claims to Medicaid as late as May 2015, almost three years after the scheme began and over a year after Ahmed's license had been suspended for fraud.

The behavior in this case was not an aberration. It was part of an on-going fraudulent scheme that spanned years. The Defendant's actions, which included repeatedly submitting false billings to Medicaid over a nearly three-year period, were not just one single bad decision or a moment of rash behavior. This behavior was deliberate, repetitive, and ongoing.

The motivation for the Defendant's actions is simple. Over the course of the entire scheme, including DES and Universal Smiles billing, the Defendant was paid $1,442,347.13 for her work through her company, Emerald Consultants. During the height of the scheme, between July 2013 and February 2014, when Medicaid was falsely being billed the most for provisional crowns, the Defendant was regularly taking home *over $100,000 a month*, on top of her salary, as noted in the chart below showing payments to the Defendant (or the Defendant's company Emerald Consultants) from Universal Smiles or DES over the course of the conspiracy.



Unfortunately, given the nature of the scheme, where dental records cannot be trusted, there is no physical proof of whether a provisional crown was actually provided to a patient, and where it is possible, though unlikely, that a patient could need more than one provisional crown on a tooth, it is impossible to know which specific provisional crowns were never provided to the patients. Thus, it is not possible to say with certainty the exact amount Medicaid reimbursed the dental practice for services billed but not provided. It was due to this uncertainty that the government agreed to use gain as a proxy for the loss in the plea agreement, consistent with Comment 3(B) under Section 2B1.1 of the Guidelines. As the Defendant earned 15% of the income from the dental practice, this leads to a loss calculation of $813,184, which is equal to 15% of the approximately $5.4 million paid by Medicaid for provisional crowns between August 2012 and April 2014.[2]

---

[2] There were additional provisional crowns fraudulently billed after April 2014, such as those from April and May 2015 that are described in the Statement of Offense. However, because the fraudulent billing was smaller and more sporadic, it is even more difficult to determine which were fraudulent and which were not.

It is very likely that this method of using gain as a proxy for the fraud amount undercounts the total fraud. As noted in Attachment A to the Statement of Offense and explained above, the Defendant and Ahmed billed Medicaid from 100 to over 500 provisional crowns for 100 different patients. It seems extremely unlikely that over 100 patients needed to have three or more different provisional crowns placed on every single tooth during this time frame. Indeed, the entire point of a provisional crown is to provide a longer lasting and more durable temporary crown before a permanent crown is placed. Even if every patient listed in Attachment B who received 32 or fewer provisional crowns (meaning a provisional crown on every tooth in their mouth including wisdom teeth, on which dentists do not commonly place crowns) between August 2012 and April 2014 were omitted from the tally of claims and payments -- there would still be over $5 million dollars worth of (likely false) claims for provisional crowns paid by Medicaid.

### 2. *Lasting Impact on Medicaid Beneficiaries*

Dentists play a crucial role in the Medicaid program, as their services are necessary to meet the needs of the beneficiaries. According to the D.C. OIG Medicaid Fraud Control Unit, in 2019, approximately 28% of D.C. residents received Medicaid benefits. These beneficiaries are some of the poorest and most vulnerable residents of the District – indeed currently the eligibility requirements include that the individual make less than $17,131 (before taxes). Medicaid trusts that the providers who are billing for services for the poorest members of our community are actually providing these services. The Defendant (and Ahmed) took advantage of this trust and enriched themselves with money that could have and should have been spent on dental services for needy District residents.

Because of the Defendant's and Ahmed's choices, some of the most vulnerable members of our society will continue to face long lasting and very real negative impacts– namely the

Medicaid beneficiaries who went to their dental clinic for assistance. These patients will forever have to deal with the fact that their dental records have been falsified and cannot be relied upon when they seek care. The need for accurate medical records is obvious – without a clear and accurate record of the treatment they received, the patients risk receiving worse care in the future or, in some cases, risk being unable to get care at all.

This risk unfortunately became a reality for at least one of the patients -- Patient xxxx5582, for whom the Defendant and Ahmed billed Medicaid for 55 provisional crowns. When interviewed, this patient explained that she was supposed to get snap on dentures from Universal Smiles that would connect to screws surgically implanted in her mouth. For some reason, the patient never received the dentures from Universal Smiles and was left with uncovered screws in her mouth. She then attempted to get help from a different dentist – who was unable to work on her teeth because the new dentist needed accurate information about what dental work had already been done by Universal Smiles. When last interviewed, this patient had still not been able to get the work on her teeth completed by another dentist. She was left with exposed screws in her mouth. The patient was unable to eat anything but pureed foods and had lost weight as a result.

The Defendant and Ahmed did not just line their pockets by lying about what services had been provided. They did not just take away needed funds from a program designed to provide care to the neediest and most vulnerable members of the District. Nor did they just steal money from all those who pay taxes in the District to fund this program. They did all that and more. Their choices – particularly the choice to repeatedly use fraudulent dental records as part of the scheme – also caused real damage to the Medicaid beneficiaries they were supposed to be helping.

B. **History and Characteristics of the Defendant**

The Defendant has no criminal convictions, has a record of employment and education, and has a stable family life. In addition, the Defendant has had charges pending in this case since 2019 and has abided by her release conditions and complied with all requirements. All these points weigh in favor of a more lenient sentence.

On the other hand, the Defendant's situation has been stable like this for a long time and, despite this stable background, she still chose to engage in this fraudulent scheme over a period of years. The Defendant has been granted numerous benefits in life, including ones that appear to have been fueled in part by the proceeds of her fraudulent activity – such as the $1.4 million home she and her husband bought in August 2015 -- yet she chose to commit (and continue committing) this crime nonetheless.

Finally, to the extent the Defendant deserves credit for her acceptance of responsibility in this case, she has already received it in the form a plea offer to less than the full indictment,[3] a loss calculation using her gain as a proxy for loss, and a three-point reduction in her offense level based on her early acceptance.

### C. Need to Avoid Unwarranted Sentence Disparities

Although it is true that Ahmed accepted responsibility for his actions very early (whereas the Defendant pled only a few months before her scheduled trial) and Ahmed agreed to debrief with the government repeatedly about his actions – both of which warranted consideration for a lower sentence – it is also true that Ahmed's 71 month concurrent sentence to the 16 years he is serving for sexually abusing patients at the same dental clinic where this fraud occurred creates some risk of an unwarranted sentencing disparity. As a result, and per the plea agreement, although

---

[3] Had the defendant been required to plead guilty to Counts 3 through 7 of the indictment, wire fraud in violation of 18 U.S.C. § 1343, her base offense level under the Guidelines would have been 7 instead of 6.

14

the government is asking for a sentence of incarceration, the government has agreed to not oppose some portion of the sentence being completed via home detention as a substitute for imprisonment.

   D. **<u>Deterrence</u>**

As the Sixth and Eleventh Circuits have found, because white collar crimes "are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." <u>United States v. Musgrave</u>, 761 F.3d 602, 609 (6th Cir. 2014) (internal citations omitted). Health care fraud has been, and continues to be, a substantial problem both nationwide and in the District. Those who participate in this sort of white-collar crime undoubtedly monitor the cases of others charged with similar crimes and weigh the costs of a potential prison sentence against the benefits of their potential ill-gotten gains. Thus, sentences that include a meaningful period of incarceration do serve a legitimate deterrent purpose.

The Health Care Fraud Strike Force began operations in 2009, with two of its main Strike Forces in Detroit and Miami. Approximately 1,000 individuals have been indicted in these Districts in connection with a number of Medicare fraud schemes. The deterrence effort has paid off. Between 2010 and 2017, costs in the Eastern District of Michigan and Southern District of Florida for Medicare Part A, which covers home health care, and Part B, which covers physicians' services, have decreased by approximately 9%, resulting in a total savings of almost $1 billion in each district, which is twice as much in savings in any other district. In short, there can be no doubt that these targeted prosecutions have deterred others from defrauding the Medicare program and protected the public.

Deterrence in health care fraud cases is perhaps the most important factor of all of the § 3553(a) factors. The federal government and the D.C. government simply do not have the resources to investigate every health care provider who submits questionable claims to Medicaid

for reimbursement or to perform audits of health care providers to ensure that taxpayer funds are not being diverted for private benefit through fraud. The sentence in this case must, therefore, be sufficiently severe to deter health care fraud by all unscrupulous health care providers. The message should be clear and unambiguous -- health care fraud is not tolerated, and if the fraudulent conduct is discovered, the punishment will be just, appropriate, and severe enough to counter the damage that the fraudulent conduct has caused the health care system. A conviction without serious punishment is no deterrent at all. Indeed, a conviction without a lengthy period of incarceration for such egregious and highly profitable health care fraud scheme will only invite imitators.

## V. CONCLUSION

All of the money involved in this scheme came from the Medicaid program. Such fraud has real and tangible consequences: every dollar stolen from Medicaid is a dollar that could have been used to provide valuable services to Medicaid beneficiaries, who are often the most physically and financially vulnerable members of our society. Accordingly, the United States respectfully requests that the Defendant's punishment reflect the need to promote respect for the laws that protect the public and guard against health care fraud.

For the reasons set forth above, the United States requests this Court to (1) impose a sentence of 30 months of incarceration but does not oppose some portion of that sentence being completed via home confinement; (2) impose a term of supervised release of 3 years; (3) order the Defendant to pay restitution in the amount of $813,184; and (4) enter a forfeiture money judgment in the amount of $813,184. Such a sentence reflects the seriousness of the offense and provides effective specific and general deterrence.

Respectfully submitted,

/s/ *Melissa Jackson*
Melissa Jackson (D.C. Bar No. 996787)
Assistant U.S. Attorney
Fraud Section
U.S. Attorney's Office for the District of Columbia
555 Fourth Street NW
Washington, DC 20530
(202) 252-7786
Melissa.Jackson@usdoj.gov

/s/ *Gary A. Winters*
Gary A. Winters (D.C. Bar No. 439376)
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 598-2382
Gary.Winters@usdoj.gov