**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Criminal No. 19-0026-02 (CKK) |
| | ) |
| MAHSA AZIMIRAD, | ) |
| | ) |
| Defendant. | ) |

## MAHSA AZIMIRAD'S MEMORANDUM IN AID OF SENTENCING

Defendant Mahsa Azimirad, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons that follow, and for any additional reasons that may be cited at the sentencing hearing, the defense respectfully requests that the Court sentence Ms. Azimirad to a period of probation with, inter alia, a condition of home detention.

## INTRODUCTION

Ms. Azimirad made a grievous error when she submitted claims to Medicaid for provisional crowns that were not actually provided to patients of the dental practices where she worked. She acknowledges her culpability and is deeply regretful for her part in the fraudulent scheme. As the Court considers what sentence to impose, we ask the Court to take into account Ms. Azimirad's character, the circumstances of her offending conduct, and the sentence received by her co-defendant, Bilal Ahmed.

Apart from the conduct at issue in this case, Ms. Azimirad's life has been marked by a deep sense of ethics, hard work, kindness, and generosity. She is the person who is always there for those in her wide orbit who are in need, even before they ask for help. She is a full-time stay-at-home parent to two young children, including a five-year-old daughter with special needs

whose progress at this fundamental time in her development has been due mainly to her mother's constant efforts and interventions.  Ms. Azimirad's friends, acquaintances, and family know her as someone who goes out of her way to use her organizational skills, outgoing personality, and boundless energy in service of those around her who are struggling with obstacles, whether small (a messy house near the end of a pregnancy) or large (a child's diagnosis with autism).

Ms. Azimirad was taught by her parents, immigrants who made a successful life in this country, to work hard at everything she did.  But as an office manager for Bilal Ahmed, she worked far too hard to please him, following his directions to submit claims for provisional crowns in astronomical numbers, even when common sense and evidence to the contrary should have made it apparent that the work billed was not done.  Unlike Mr. Ahmed, Ms. Azimirad did not treat the patients for whom work was falsely billed.  Instead, her task was to enter the claims.  This she did, and for this very serious breach of the law, the public trust, and her own strong moral code, Ms. Azimirad is deeply sorry.

Mr. Ahmed, who has been convicted of sexually assaulting five of his patients and two of his employees, is serving a sentence in this case that runs concurrently with his aggregate sentence for multiple sexual assaults.  It would be both unfair and an unwarranted sentence disparity for Ms. Azimirad, whose misconduct occurred at Mr. Ahmed's direction and without the same level of actual knowledge he possessed, to be sentenced to a term of incarceration when Mr. Ahmed received no additional time in prison for his part in the fraud.

Ms. Azimirad has already suffered substantial punishment, including the shame of conviction and the limitations placed on her over the two-and-a-half years since charges were filed.  There is no risk she will re-offend.  She has no other criminal history and has been impeccably compliant with her conditions of release.  The United States Probation Office

recommends a variance below the Guidelines range, and we agree that a variance is appropriate. For the reasons discussed below, we respectfully submit that a just and appropriate sentence is a term of probation with a condition of home detention.

## BACKGROUND

I. Ms. Azimirad's Background

### A. Early Life

Ms. Azimirad, whose maiden name is Mahsa Parelkar, was born in 1980 in Kenya to immigrant parents. Her father, Ajit Parelkar, is from India, and her mother, Mahvash Parelkar, is from Iran. At the time of Mahsa's birth, Ajit was working as an architect for the World Bank in Nairobi. When Mahsa was five years old, her father's contract with the World Bank ended and the family immigrated to the United States. Mahsa and her younger brother Sahba became citizens of the United States on October 29, 1994, when their parents were naturalized.

Mahsa grew up in a tight-knit family, sheltered by her conservative parents. The family followed the Baha'i faith, a religion whose followers have been subjected to extreme state persecution in Iran. In Maryland, Mahsa's family was part of a tight-knit Baha'i community that helped and relied on one another in what was for many, like Mahsa and her parents, a new country and culture.

Mahsa's parents raised her to work hard and to help others. They led by example. Despite coming from little, once in the United States Ajit continued his career as an architect and eventually developed a new career as a gemologist. Mahvash became a successful social worker. They established themselves in their new community in Gaithersburg and were always there to provide assistance to friends and neighbors in need.

In elementary and high school, Mahsa was a strong student, but she struggled when she started community college in Rockville, Maryland.  In 2003 she was diagnosed with ADHD and prescribed Adderall, and she has also intermittently been treated for depression and anxiety. Mahsa persevered and ultimately went on to graduate from the University of Maryland, obtaining a B.A. in psychology and a B.S. in biology, while maintaining part-time jobs while she was in college.

### B.  Ms. Azimirad's Family

In 2006 Mahsa married her husband, Ardalan ("Ardy") Azimirad.  Ardy is Iranian by birth and was naturalized as a United States citizen in the 1980s.  He owns a small car dealership that provides the main source of income for the family.  The couple has two children.  Their son "S" is seven years old, and their daughter "R" is five years old.  Mahsa experienced complications with both pregnancies, and both children were born prematurely.

Mahsa is the children's primary caretaker and has mainly been a stay-at-home parent for the past four years.  Ardy is the sole owner of his business.  Keeping it running is a significant task that requires him to work long hours.  Mahsa is therefore responsible for most of the day-to-day care of their young children, who are deeply dependent on her.

Mahsa devotes exceptional time and attention to her daughter R, who has been diagnosed with a developmental disability impacting her communication, cognition, and social emotional skills.  R has made progress since her diagnosis in large part because of the significant time that Mahsa spends working with her.  In addition, R has an autoimmune skin disorder, Lichen sclerosus, that requires special treatment.  Due to the sensitive location of the affected skin, R generally will only allow Mahsa to administer the necessary treatment.

Mahsa's parents live near her and her family.  They are in their late sixties and Mahsa helps care for them.  In addition, Mahsa provides help to a wide range of friends and neighbors, including a family of Peruvian immigrants to whom she provides assistance and friendship and who have become a de facto part of her family.

II.   THE OFFENSE CONDUCT

Bilal Ahmed was a licensed dentist in the District of Columbia and the sole proprietor of Universal Smiles dental practice, which was located at 2311 M Street NW in Washington D.C. After the D.C. Dentistry Board suspended Ahmed's dentistry license in or about November 2014, Ahmed formed a limited liability company called Dental Equipment and Services, LLC ("DES"), which engaged in the business of providing business support services required by dental practices, in addition to providing office space, equipment, technology, human resources, furnishings, supplies, inventory, and marketing services.  Dkt. 133 (Statement of Offense) at 2.

On or about March 9, 2012, Ahmed, doing business as Universal Smiles, submitted a provider application to the D.C. Department of Health, Medical Assistance Administration, to become a group D.C. Medicaid dental provider.  The provider application indicated that Ahmed was the sole owner of the dental practice.  Ahmed became an approved group D.C. Medicaid dental provider effective on or about June 13, 2012.  Ahmed, through Universal Smiles and DES, hired several dentists to work at the dental practice during the period from August 2012 through February 2016.  *Id.* at 4.

Ms. Azimirad was hired as the marketing and operations manager for Universal Smiles and eventually performed the same function for DES.  Ahmed required Ms. Azimirad to submit, and cause to be submitted, claims for payment for Medicaid patients.  Ms. Azimirad submitted those claims to Medicaid electronically.  Beginning in or about 2015, Ms. Azimirad hired a third-

party biller, C.H., who was physically located in North Carolina, to submit the claims for payment to Medicaid. Ms. Azimirad provided billing information by electronic mail to C.H. so that the claims could be submitted to Medicaid through its web-based portal. *Id*. at 2-3. Ms. Azimirad instructed dentists hired by Ahmed who were not D.C. Medicaid providers on how to enroll in the program. Ahmed requested several of the dentists to open bank accounts and post office boxes. Medicaid payments mailed to the post office boxes were collected by Ms. Azimirad and deposited by Ms. Azimirad into the accounts. Ahmed directed how the Medicaid funds were to be disbursed from those accounts. *Id.* at 4-5.

Ms. Azimirad contracted for commercials that advertised Universal Smiles and its acceptance of both Medicaid and additional types of insurance to be run on a local television station, WDC50, to attract patients. Ahmed agreed to pay Ms. Azimirad up to 15% of the practice's monthly income after expenses. Such payments were made to Ms. Azimirad's company Emerald Consultants, LLC, which was owned and operated by Ms. Azimirad. *Id*. at 5.

Ahmed and Ms. Azimirad submitted false claims to Medicaid for provisional crowns that were not provided to beneficiaries. The Medicaid billing scheme was executed through means including:

- Ahmed placing Ms. Azimirad in charge of billing and solely in charge of Medicaid billing;

- Ms. Azimirad having access to all of the dentists' log-in information for Medicaid billing;

- Ms. Azimirad controlling the billing that was submitted to Medicaid, even when she was not physically in the office and after the third-party biller was hired;

- Ms. Azimirad monitoring and correcting, and if needed entering herself, the Medicaid billing information after the third-party biller was hired;

- Ahmed annotating beneficiaries' dental records, directly or indirectly through assistants, to add provisional crowns that he did not provide;

- Ms. Azimirad submitting false claims to Medicaid for provisional crowns or other services that were not supported by or that conflicted with the services contained in the beneficiaries' dental records, including for missed or rescheduled appointments and for beneficiaries who had no teeth;

- Ms. Azimirad accessing bank accounts and post office boxes that Ahmed required dentists to open; and

- Ms. Azimirad knowingly and/or willfully ignoring fraudulent entries in beneficiaries' dental records and fraudulent Medicaid billing.

*Id.* at 6.

Specifically, evidence would have established that the following false claims were submitted to Medicaid.

- Between on or about July 11, 2013, through on or about February 3, 2014, Ahmed and Azimirad submitted and caused to be submitted claims to D.C. Medicaid which falsely claimed that Medicaid beneficiary XXXX4124 had been provided with 51 provisional crowns, knowing or deliberately ignoring that the dental services had not been provided.  *Id.* at 7.

- Between on or about April 3, 2013, through on or about February 19, 2014, Ahmed and Azimirad submitted and caused to be submitted claims to D.C. Medicaid which falsely claimed that Medicaid beneficiary XXXX0996 had been provided with 524 provisional crowns, knowing or deliberately ignoring that the dental services had not been provided.  *Id.*

- Between on or about July 24, 2013, through on or about January 30, 2014, Ahmed and Azimirad submitted and caused to be submitted claims to D.C. Medicaid which falsely claimed that Medicaid beneficiary XXXX5916 had been provided with 295 provisional crowns, knowing or deliberately ignoring that the dental services had not been provided.  *Id.*

- Ahmed and Azimirad submitted and caused to be submitted a claim to D.C. Medicaid which falsely claimed that on or about April 7, 2015, dental services were provided to Medicaid beneficiary XXXX0373, that is the placement of 15 provisional crowns, knowing or deliberately ignoring that the dental services had not been performed because the patient's file reflected that the patient received three provisional crowns.  *Id.*

- Ahmed and Azimirad submitted and caused to be submitted a claim to D.C. Medicaid which falsely claimed that on or about May 7, 2015, dental services were provided to Medicaid beneficiary XXXX3370, that is the placement of 14 provisional crowns, knowing or deliberately ignoring that the dental services had

not been performed because the patient's file reflected that the patient received dental services on one tooth. *Id*. at 8.

- Ahmed and Azimirad submitted and caused to be submitted a claim to D.C. Medicaid which falsely claimed that on or about May 7, 2015, dental services were provided to Medicaid beneficiary XXXX2012, that is the placement of 6 provisional crowns, knowing or deliberately ignoring that the dental services had not been performed because the patient's file reflects that no new provisional crowns were provided. *Id.*

Provisional crowns accounted for $5,421,227 of the money that Medicaid paid to Universal Smiles from August 9, 2012, through on or about February 26, 2014. An undetermined but significant number of the provisional crowns reimbursed were not actually provided to patients. Through the agreement between her company Emerald Consultants, LLC and Universal Smiles, Ms. Azimirad received approximately $1,442,347.13 from August 9, 2012, to February 22, 2016. *Id.* at 9.

### C. THE PLEA AGREEMENT AND PRE-SENTENCE REPORT

On May 24, 2021, Ms. Azimirad pleaded guilty to one count of Health Care Fraud (Count Two of the Indictment), in violation of 18 U.S.C. §§ 1347 and 2. Under the plea agreement, the parties agreed that the appropriate loss amount under Sentencing Guidelines §§ 2B1.1 and 1B1.3 was $813,184. The parties further agreed that the total offense level under the Sentencing Guidelines would be 17 as a result of an offense level of 20 (i.e., a base offense level of 6 under § 2B1.1(a)(2) and 14 levels added under § 2B1.1(b)(1)(H) due to a loss amount in excess of $550,000) and a 3-level reduction for acceptance of responsibility. Dkt. 132 (Plea Agreement) at 2-3. Based on a Criminal History Category of I, the parties believed Ms. Azimirad's sentencing range would be 24-to-30 months. *Id.* at 3. Ms. Azimirad also consented to a forfeiture money judgment in the amount of $813,184 and a restitution amount of $813,184. *Id.* at 7-8.

Under the plea agreement, the defense is free to seek a sentence below the Guidelines range based on the factors set forth in 18 U.S.C. 3553(a). *Id.* at 4. Meanwhile, while the

government stated that it "will ask for a sentence of imprisonment in its allocution," it agreed

that it would "not oppose the Court ordering some portion of the sentence to be completed via

home detention as a substitute for imprisonment." *Id.*

The U.S. Probation Office agreed with the parties' Guidelines calculations and restitution

amount. Dkt. 137 (Presentence Report) ¶¶ 41-51, 129. The Probation Office recommended a

variance from the applicable Guidelines, "due to the defendant's role as the primary caregiver for

her developmentally delayed daughter." Dkt. 138 (USPO Sentencing Recommendation) at 2.

The Probation Office suggested a sentence of 12 months and 1 day of imprisonment, to be

followed by a 36-month term of supervised release. *Id.*

## ARGUMENT

I. LEGAL STANDARD

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the analytical

framework for a sentencing court to employ:

> As we explained in *Rita* [*v. United States*]*, a district court should begin all
> sentencing proceedings by correctly calculating the applicable Guidelines range.
> *See* 551 U.S., at 347-348, 127 S. Ct. 2456. As a matter of administration and to
> secure nationwide consistency, the Guidelines should be the starting point and the
> initial benchmark. The Guidelines are not the only consideration, however.
> Accordingly, after giving both parties an opportunity to argue for whatever
> sentence they deem appropriate, the district judge should then consider all of the
> [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence
> requested by a party. In so doing, [s]he may not presume that the Guidelines
> range is reasonable. *See id.,* at 351, 127 S. Ct. 2456. [Sh]e must make an
> individualized assessment based on the facts presented. If [s]he decides that an
> outside-Guidelines sentence is warranted, [s]he must consider the extent of the
> deviation and ensure that the justification is sufficiently compelling to support the
> degree of the variance. We find it uncontroversial that a major departure should
> be supported by a more significant justification than a minor one. After settling
> on the appropriate sentence, [s]he must adequately explain the chosen sentence to
> allow for meaningful appellate review and to promote the perception of fair
> sentencing. *Ibid.*, 127 S. Ct. 2456.

*Gall*, 552 U.S. at 49-50 (footnote omitted).

Section 3553(a) puts forth seven factors a court "shall consider" at sentencing.  18 U.S.C. § 3553(a).  First, the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Second, the court "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the [following] purposes": "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2) (emphasis added).  Third, the court must contemplate "the kinds of sentences available."  18 U.S.C. § 3553(a)(3).  Fourth, the court shall factor in "the sentencing range established" by the Sentencing Guidelines.  18 U.S.C. § 3553(a)(4).  Fifth, the court must assess "any pertinent policy statement" issued by the Sentencing Commission.  18 U.S.C. § 3553(a)(5).  Sixth, the court must assay "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Seventh, the court shall examine "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).

II.  A SENTENCE OF PROBATION WITH HOME DETENTION IS WARRANTED

In Ms. Azimirad's case, the statutory factors warrant a sentence of probation with a condition of home detention.  Such a sentence would adequately punish Ms. Azimirad, protect the community, and deter criminal conduct, but would avoid being harsher than necessary given the circumstances of the offense and Ms. Azimirad's history and character as a fundamentally ethical person and essential caretaker to her young children.  It would also avoid a significant disparity with the sentence received by her co-defendant.

A. *Ms. Azimirad's History and Characteristics Warrant a Sentence of Probation with a Condition of Home Detention.*

In imposing a sentence, the Court should consider Ms. Azimirad "as an individual." *Koon v. United States*, 518 U.S. 81, 113 (1996). As the letters submitted on her behalf (attached as Exhibits 1 to 19) make amply clear, the offense in this case was deeply out of character for Ms. Azimirad, who is known and cherished by her friends, family, former colleagues, and neighbors as a trustworthy, kind, and uncommonly generous person and as a devoted parent who provides necessary care and support to her young children.

1. The offense was out of character for Ms. Azimirad, who has otherwise been a trustworthy and hardworking person of integrity.

Apart from the offense in this case, Ms. Azimirad has lived ethically, followed the law and the rules, worked hard in all aspects of her life, and been a trustworthy and responsible person. Raised in a faith-driven household, Mahsa has been a valuable member of the community since her youth, with a "selfless spirit of service," "strong moral character," "strong work ethic," and "willingness to sacrifice" for others. Exhibit 3 (letter from K. Bahrami).

Dr. Anil Manda, a dentist with whom Mahsa worked after she left Universal Smiles, describes her as "one of the most professional, hardworking, ethical, responsible, and selfless people I have had the privilege to work with." Exhibit 12 (letter from A. Manda). Mahsa's character as a hardworking and responsible person is echoed by others, who have experienced these qualities from different angles and in the context of different relationships to Mahsa. *See, e.g.*, Exhibit 1 (letter from A. Azimirad, husband); Exhibit 14 (letter from E. Olale, friend and college classmate); Exhibit 15 (letter from S. Parelkar, brother); Exhibit 6 (letter from N. Chung, childhood friend); Exhibit 9 (letter from G. Hernandez, former colleague).

Mahsa has long been an active member of her community, with a "passion for helping others." Exhibit 3 (letter from K. Bahrami). *See also* Exhibit 8 (letter from A. Golriz) (describing how Mahsa is "an engaged member of her community"); Exhibit 10 (letter from N. Hossein) ("She has always been an active part of her religious community."). As the letters submitted to the Court attest, she is a person who has long contributed, in meaningful ways, to the community.

The government acknowledges that Mahsa has a "record of employment and education" and no criminal convictions. Dkt. 139 (Government's Memorandum in Aid of Sentencing) at 14. Her ethical character is not an artifact solely predating the conduct for which she is to be sentenced. Since charges were filed in this case in January 2019, Mahsa has continued to demonstrate her fundamental character as a law-abiding and responsible citizen by complying with all requirements and conditions of release. *Id.*

The record is clear that Mahsa's actions in this case, for which she must be held accountable, were aberrant by the high standards to which she has adhered in all other aspects of her life. Probation is an appropriate sentence that takes into account Mahsa's fundamentally moral and law-abiding character and the benefit to the community from her continued active engagement.

2. <u>Ms. Azimirad is unfailingly kind and generous.</u>

The testimonials submitted by her friends, family, and acquaintances return again and again to two traits that are at the heart of who Ms. Azimirad is: her kindness and her generosity. Her friend Zachary Pittman observes that Mahsa "came from a faith-filled family that often placed the comfort and needs of others before their own." Exhibit 17. Whether an innate characteristic, a faith-inspired calling, a value instilled by her parents, or some combination

thereof, Mahsa's instinct to always lend a helping hand, whether for needs small or monumental, has been a comfort and benefit to those in her life.

When Esther Olale immigrated to the United States from Kenya, Mahsa helped her integrate into the community, excel at school, and earn scholarships to ensure she graduated with no educational debt.  Exhibit 14 (letter from E. Olale).  Similarly, Mahsa invited Iris Chai into her home and family when Iris moved to the Washington D.C. area knowing only two people. Mahsa "made sure [Iris] was not lonely, especially during the holidays," took care of her pets while Iris was traveling, and introduced Iris to her friends and family, to such extent that Iris came to consider Mahsa's family her own "Maryland family."  Exhibit 5 (letter from I. Chai). When Amanda Borba considered moving from New Jersey to Maryland, Mahsa swiftly reached out to her.  "She sent me a list of job opportunities and told me I could stay with her in her home until I got on my feet.  Which is something I will always remember."  Exhibit 4 (letter from A. Borba).

Mahsa has also lent help and support to other mothers, in concrete ways that go far beyond a simple listening ear or warm hug.  Agnieszka Golriz writes that when her own son was diagnosed with autism, Mahsa helped her to identify the best resources and support for him. Exhibit 8 (letter from A. Golriz).  Mahsa helped Nazanin Hossein clean her house when Nazanin was overwhelmed while expecting her third child, and when Nazanin had difficulty finding a venue for her oldest son's birthday party, Mahsa found a location and put down a security deposit to secure the reservation.  Exhibit 10 (letter from N. Hossein).  Shina Hossein is a single mother who has found Mahsa's support invaluable, writing to the Court that during the pandemic, "[w]hen I was losing my mind in unpacking, working and managing at home schooling I could text her and she would literally plan my day with me and help me organize my

days and thoughts in more manageable ways." Exhibit 11 (letter from S. Hossein). And when Kameh Bahrami was suffering from postpartum depression after the birth of her first child, Mahsa was there for her to lean on. Exhibit 3 (letter from K. Bahrami).

Mahsa's generosity does not only extend to close friends. She helped a Peruvian grandmother navigate the immigration system to bring her daughter and grandchildren to the United States, and then integrated the newly immigrated, multi-generational family into her own. *See* Exhibit 15 (letter from S. Parelkar). One of Mahsa's former colleagues lived in the D.C. area for only six months nearly a decade ago, before moving back to Minnesota. But recently when her daughter moved to Maryland to work at the NIH, "Mahsa immediately offered to help find housing, offered to show her around the area and to have her into her home whenever she felt homesick or wanted to be around people." Exhibit 19 (letter from A. Yakymi).

These letters make it apparent that Mahsa is, at her heart, a giver. She goes out of her way to help others, often before they even ask. As a result, she has a community of friends, neighbors, and family members who rely on her support, assistance, and presence in their lives.

### 3. Ms. Azimirad's children are deeply dependent on her care and support.

The other theme that leaps from the pages of the letters submitted to the Court is Mahsa's intense devotion as a mother to her two young children and the extent to which they absolutely rely on her. Mahsa was the first to identify her daughter R's developmental disability, and she spends hours each day working with R to help R overcome it. Many of the family's friends have noted that R's condition has not improved simply through time or the interventions of school and therapy, but because of Mahsa's single-minded focus on helping her daughter progress.

Mahsa's husband Ardy works long hours at his job, and Mahsa is the one who raises and cares for the children. *See* Exhibit 5 (letter from I. Chai). This full-time care has been essential

14

to R's development at a critical time—R is only five years old.  She has never spent a day apart from her mother, and while she has improved greatly with Mahsa's attention, her communication and learning skills continue to be delayed.  *See* Exhibit 1 (letter from A. Azimirad); Exhibit 6 (letter from N. Chung).

Those who have seen Mahsa interact with her children are inspired by her relationship with them.  They note that she "spend[s] all her time caring for them," Exhibit 3 (letter from K. Bahrami); that she "teaches them to be polite, kind, and the best little humans they can be," Exhibit 5 (letter from I. Chai); that she researched and secured the necessary intervention services for R and, more importantly, has implemented the training provided by those services on a day-to-day basis as is necessary to effectuate progress, Exhibit 6 (letter from N. Chung); that her interaction with her son S demonstrates an enviable and "extraordinary parenthood playbook," Exhibit 7 (letter from P. Golriz); that her abilities with her children stand out as unique and that she has been gentle and effective, as well, at helping her friend Shina's young son learn how to interact positively with R, Exhibit 11 (letter from S. Hossein).

Mahsa's children depend on her.  The Presentence Report writer, after visiting Mahsa's family's home, noted that although the children have their own bedrooms, they also have small mattresses in the master bedroom because they often sleep close to their mother.  Dkt. 137 ¶ 70.  Many of the letter writers express well-founded concern that R's development will suffer greatly without Mahsa to care for and work with her.  R and S's dependency on their mother, and particularly R's unique health circumstances, weigh strongly in favor of a sentence of probation with a condition of home detention.

> B.  *The Nature and Circumstances of the Offense Warrant Probation with a*
>      *Condition of Home Detention.*

Ms. Azimirad fully acknowledges the seriousness of the offense and in no way seeks to

minimize it.  To the contrary, she sincerely regrets her actions and accepts that she must suffer

consequences.  We respectfully ask the Court to consider the nature and circumstances of the

offense, and in particular Ms. Azimirad's part in it, which we believe warrant a sentence of

probation with a condition of home detention.  A sentence of probation with a condition of home

detention would significantly punish Ms. Azimirad for her offense while not being harsher than

necessary given the particular circumstances of that offense and the other 18 U.S.C. § 3553(a)

factors.  *See Gall v. United States*, 552 U.S. at 47 ("Offenders on probation are . . . subject to

several standard conditions that substantially restrict their liberty. . . .  Most probationers are also

subject to individual 'special conditions' imposed by the court.").

> 1.  <u>Ms. Azimirad is not a clinician and did not treat patients.</u>

Ms. Azimirad's role at Universal Smiles and DES was as an office manager and

marketing professional.  She submitted bills to Medicaid that falsely claimed that provisional

crowns were provided to patients when in fact they were not.  The seriousness of this conduct

cannot be understated.

It is nonetheless important to note that Ms. Azimirad did not herself provide treatment,

either as a dentist or as a dental assistant, to the patients at issue.  Unlike Mr. Ahmed, who

treated the patients, falsified their medical charts, and instructed Ms. Azimirad what to bill, Ms.

Azimirad's crime was largely one of deliberate ignorance.  Relying on the fact that many of the

practice's Medicaid patients had serious dental issues requiring extensive reconstructive work, a

large volume of lab work, and that Mr. Ahmed's expressions of satisfaction that Medicaid's

coverage in D.C. allowed him to do extensive reconstructive work, she "deliberately closed her

eyes to what would otherwise have been obvious to her in that [she] actually believed that there was a high probability that the dental services had not been provided and consciously took deliberate actions to avoid learning that the dental services had not been provided." Dkt. 133 at 8.

Again, we in no way minimize the seriousness of the offense: given the excessively large number of provisional crowns billed, it should have been obvious to Ms. Azimirad that significant fraud was taking place. We submit, however, that Ms. Azimirad's role in the scheme—as a subordinate employee who did not have first-hand knowledge of what work was (or was not) performed on each patient, who had neither responsibility for nor the ability to develop treatment plans, and who followed her dentist employer's instructions when submitting the claims at issue—weighs in favor of a sentence of probation.

2.  Ms. Azimirad was under overwhelming pressure at work.

There is no excuse for Ms. Azimirad's willfully ignoring that claims she submitted for provisional crowns were fraudulent, but we respectfully ask the Court to consider the extremely demanding work environment created by Mr. Ahmed as context for this offense by an otherwise law-abiding woman. Ms. Azimirad did not merely handle billing for the dental practice—she ran the office, including human resources, staff training, scheduling, payroll, and marketing. She filled in for staff members who were out sick or for family reasons. *See* Exhibit 9 (letter from G. Hernandez). Due in large part to Ms. Azimirad's marketing efforts, the practice was very busy, and Ms. Azimirad struggled to keep up, constantly feeling as though she were barely staying afloat.

By nearly all accounts, Mr. Ahmed was a harsh, critical, manipulative, and constantly demanding boss. *See, e.g.*, Exhibit 19 (letter from A. Yakymi). Ms. Azimirad perceived that

through her hard work, organizational skills, and successful marketing strategies, she had gained

Mr. Ahmed's trust, and she was eager to keep it.  Raised by her parents to work hard at any job

she undertook, Ms. Azimirad viewed the smooth functioning of the dental office as her

responsibility and, consequently, worked long and frantic hours completing not just the tasks

directly assigned to her, but supervising the other administrative employees to ensure their work

lived up to Mr. Ahmed's demands.

      While it is no excuse for her conduct that she was under so many demands at work, of

which entering billing was only one part, it does provide some context for understanding how an

otherwise law-abiding person could turn a blind eye to the fraudulent claims she submitted.

      3.  <u>Ms. Azimirad was on maternity leave through some of the most egregious billings.</u>

One aspect of the demanding work environment described above is that Mr. Ahmed

expected Ms. Azimirad to work through her maternity leave, albeit remotely, to such an extent

that she was doing work from the hospital even while in premature labor with her son S.  Ms.

Azimirad was on maternity leave and mostly away from the office from the time of S's birth in

November 2013 through February 2014.  It was during this time period, when Ms. Azimirad was

not in the office and had no opportunity to see the patients as they came in and out, that some of

the most egregious billings took place.  For example, many of the hundreds of provisional

crowns billed for Medicaid beneficiaries XXXX0996 and XXXX5916 were submitted while Ms.

Azimirad was on leave.  When she was out of the office, she continued to submit the billing to

Medicaid through its online portal.  Mr. Ahmed or one of his assistants in the office instructed

her what to bill, generally via text message.

      That Ms. Azimirad was on maternity leave when she submitted fraudulent bills does not

excuse her crime, and she does not argue otherwise.  We beseech the Court, however, to take

into consideration that her deliberate ignorance to these billings was in part motivated by the difficult circumstances of continuing to perform her job, remotely, while recovering from a complicated labor and delivery and caring for a premature first child.

    4.  <u>Ms. Azimirad provided real marketing services as anticipated under her company's contract with Universal Smiles.</u>

Under her marketing agreement with Universal Smiles, Ms. Azimirad could and did receive up to 15% of the dental practice's profits in return for providing marketing services. What the indictment in this case and the Statement of Offense do not make clear is that Ms. Azimirad did provide valuable marketing services to Universal Smiles. Prior to Ms. Azimirad joining the office, there was little or no public marketing of the practice. Ms. Azimirad changed that—she developed and arranged television commercials and print advertisements for Universal Smiles and launched campaigns for discounted services through the internet coupon sites Groupon and Living Social. All marketing efforts, from negotiating contracts to developing content to monitoring return on investment, were Ms. Azimirad's responsibility. These efforts were successful. Completely apart from the fraudulent billings, Universal Smiles was an extremely busy practice, and it became extremely busy after Ms. Azimirad was hired. Many of the patients whom Ms. Azimirad's advertising brought in received legitimate dental services that were properly billed either to Medicaid or to private insurance. Most of the patients for whom Mr. Ahmed and Ms. Azimirad falsely billed provisional crowns received other dental services that were legitimately provided.

Of course, the fraudulent billings dramatically inflated the amount that Ms. Azimirad received under her contract, and the amount she has agreed to forfeit and pay as restitution reflects that inexcusable fact. However, we ask the Court to understand that the contract itself

was not a mere vehicle for funneling profits of fraud to Ms. Azimirad—it was a contract for marketing services that Ms. Azimirad performed and performed well.

4.   *The Need to Avoid Unwarranted Sentence Disparities Weighs in Favor of Probation with a Condition of Home Detention.*

Sentencing Ms. Azimirad to a period of probation with a condition of home detention would serve to avoid an unwarranted sentencing disparity in this case.  At the time of his sentencing in this case, Mr. Ahmed had already been sentenced in the D.C. Superior Court to an aggregate term of sixteen-and-a-half years of imprisonment for sexually assaulting five patients and two employees.  As described by the government in its appellate brief to the District of Columbia Court of Appeals, Ahmed "sexually abused and/or inappropriately touched at least five patients and two employees over a four-year period.  He followed a common course of conduct for his patient victims: he would administer nitrous oxide, wait until the patient fell asleep, and then assault the patient."  Appellee's Br. at 3, *Ahmed v. United States*, No. 18-CF-26 (D.C. Apr. 12, 2019) (Exhibit 20) (citations omitted).  Ahmed's sexual misconduct included non-consensual oral and anal sodomy.  *Id.* at 3-5.

Ahmed's sixteen-and-a-half-year prison term in Superior Court was well within statutory limits as well as the District of Columbia's Voluntary Sentencing Guidelines, and it was less than the eighteen-and-a-half-year term sought by the government at Ahmed's sentencing hearing.  *See* Mem. Op. & J. at 3, *Ahmed v. United States*, No. 18-CF-26 (D.C. Dec. 11, 2019) (Exhibit 21).  Nonetheless, before this Court the government agreed to join in Mr. Ahmed's request for a sentence that ran concurrently with the aggregate sentence imposed in Superior Court, *see* Dkt. 36 at 4, and Ahmed was sentenced to 71 months of incarceration to run concurrently with his Superior Court sentence.  Dkt. 137 ¶ 6.  In other words, Mr. Ahmed did not receive any additional prison time for his misconduct in the instant case.

It would be unfair, and an unwarranted sentencing disparity, for Ms. Azimirad to be sentenced to prison in this case while her more culpable co-defendant avoided any prison time in addition to the time imposed for his serial sexual abuse of seven vulnerable victims. Ms. Azimirad's conduct involved a loss amount of $813,184 while Mr. Ahmed was ordered to pay a restitution figure ($5,421,227) of almost seven times that amount. Dkt. 137 ¶ 6. This case represents Ms. Azimirad's first criminal conviction, while Mr. Ahmed had previously pleaded guilty to sexually abusing seven vulnerable victims, many of whom were unconscious at the time of the abuse. In short, a sentence of probation with a condition of home detention for Ms. Azimirad would also serve to avoid an unwarranted and unfair sentencing disparity in this case.

     5.   *A Sentence of Probation with Home Detention Will Provide Just Punishment, Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public.*

The imposition of a probationary term which includes a condition of home detention would "impose a sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

First, Ms. Azimirad has already been significantly punished for her conduct. She has pleaded guilty to a federal felony offense that cannot be expunged and will significantly hinder her career pursuits for the rest of her life, will carry other numerous collateral consequences, and has caused her tremendous anxiety and shame. Her guilty plea has also resulted in significant financial hardship, as she has consented to a forfeiture money judgment in the amount of $813,184, Dkt. 137 ¶ 113, and will be subject to a restitution order in the same amount. Moreover, Ms. Azimirad has already been under court supervision for over 31 months (since February 4, 2019). During that time she has had to report weekly with the Pretrial Services Agency ("PSA"), has been unable to travel internationally due to the surrender of her passport

(and Ms. Azimirad has family and good friends living outside of the United States), and has not

been able to engage in any significant domestic travel without the prior approval of the PSA.  A

sentence of probation coupled with home detention will continue to punish Ms. Azimirad and

promote respect for the law by continuing to restrict her activities and freedoms[1] and, when

considered in conjunction with the length of her pre-trial supervision, result in Ms. Azimirad

being closely supervised for many years.  *See Gall*, 552 U.S. at 48 & n.4 ("Probation is not

granted out a spirit of leniency" but rather involves "substantial[] restict[ions]" on liberty)

(internal quotations omitted); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in

the very nature of probation is that probationers do not enjoy the absolute liberty to which every

citizen is entitled.") (internal quotations omitted).[2]

Second, a term of probation coupled with home detention will adequately address

principles of deterrence and protecting the public.  Ms. Azimirad has lived an otherwise

exemplary life, and, given what she has been through with this case, there is no risk of her re-

offending.  In any event, a sentence of probation would incentivize Ms. Azimirad to maintain the

lawful nature that she has exhibited over the past 31 months while on pretrial release, as she

would be subject to probation revocation and imprisonment if she were to violate the Court's

---

[1] "When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized.  Electronic monitoring is an appropriate means of surveillance for home detention.  However, alternative means of surveillance may be used if appropriate." U.S.S.G. § 5F1.2 cmt. n.1.

[2] Moreover, Congress has stated that "prison resources" should be "reserved for those violent and serious criminal offenders who pose the most dangerous threat to society."  Pub. L. No. 98-473, § 239, 98 Stat. 1988, 2039 (1984) (put forth as note to 18 U.S.C. § 3551).  Ms. Azimirad committed a non-violent offense and does not pose a dangerous threat to society.  Sentencing her to a term of imprisonment with the Bureau of Prisons would be costly and wholly unnecessary. *See* Dkt. 137 ¶ 128 (most recent advisory from the Administrative Office of the U.S. Courts estimates a monthly cost of $3,280 for imprisonment and $372 for probation supervision).

probationary conditions.  In short, a sentence of probation with a condition of home detention would impose a sentence sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

   6.   *Health Risks Posed by the Resurgent COVID-19 Pandemic Also Weigh in Favor of Probation with a Condition of Home Detention.*

A sentence of probation with a condition of home detention is warranted for all the reasons set forth above and is further warranted given the resurgence of the COVID-19 pandemic and the risks it would pose to Ms. Azimirad should she be incarcerated with the Bureau of Prisons.  Ms. Azimirad is vaccinated, but the incidence of break-through infections has been widely reported and is still under study.  *See* Centers for Disease Control and Prevention, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last visited Sept. 14, 2021).

Courts in this District have acknowledged that "the danger [COVID-19] poses is particularly acute in carceral settings," *United States v. Mason*, 471 F. Supp. 3d 225, 227 (D.D.C. 2020), and that "[i]t can hardly be disputed that the novel strain of the coronavirus that causes COVID-19 is much more easily transmitted in the prison environment," *United States v. Johnson*, 464 F. Supp. 3d 22, 37 (D.D.C. 2020).  42,858 federal inmates and 7,372 Bureau of Prisons staff have had COVID, and 252 inmates and 6 staff members have died from COVID. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited Sept. 14, 2021).

A sentence of incarceration in this case would be more punitive than necessary in part because of the risks to Ms. Azimirad, as well as other inmates and prison staff, posed by the

ongoing pandemic and the poorly understood incidence and effect of breakthrough infection. A sentence of probation with a condition of home detention would minimize those risks.

Moreover, under the BOP's modified operations during the pandemic, social visits are subject to institution-specific limitations. *See* Bureau of Prisons, *BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Sept. 14, 2021). These limitations would almost certainly reduce contact between Ms. Azimirad and her children beyond what would be permitted pre-pandemic. Further, any visits by the children, who are too young to be vaccinated, would entail a health risk to them. These conditions, not present during a pandemic, further weigh in favor of a sentence of probation and home detention.

## CONCLUSION

For the foregoing reasons, we respectfully request the Court to sentence Ms. Azimirad to a period of probation which includes a condition of home detention as a substitute for imprisonment. Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

Respectfully submitted,

/s/ *Gregory G. Marshall*
Gregory G. Marshall (D.C. Bar No. 1011327)
Erin K. Sullivan (D.C. Bar No. 984712)
Bradley Arant Boult Cummings LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
(202) 719-8207 (Marshall)
(202) 719-8208 (Sullivan)
gmarshall@bradley.com
esullivan@bradley.com

Scarlett Singleton Nokes (admitted *pro hac vice*)
Bradley Arant Boult Cummings LLP
Roundabout Plaza
1600 Division Street, Suite 700
Nashville, TN 37203

(615) 252-3556
snokes@bradley.com

*Counsel for Mahsa Azimirad*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of September 2021, I electronically filed this

sentencing memorandum with the Clerk of the Court using the CM/ECF system.

<u>/s/ *Gregory G. Marshall*</u>
Gregory G. Marshall

*Counsel for Mahsa Azimirad*